# IN RE SHAMIKA F. ET AL.*
## (SC 16263)

Borden, Norcott, Palmer, Sullivan and Vertefeuille, Js.[1]

Argued December 1, 2000—officially released June 12, 2001

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Reporter of Judicial Decisions

[1] The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Kenneth Paul Fox*, for the appellant (respondent father).

*Mary K. Lenehan*, assistant attorney general, with whom were *Eliot D. Prescott*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

SULLIVAN, J. The sole issue raised by this appeal is whether a temporary custody order entered by the Superior Court for Juvenile Matters pursuant to General Statutes (Rev. to 1995) § 46b-129 (a) and (b)[2] is a final

---

[2] General Statutes (Rev. to 1995) § 46b-129 provides in relevant part: "(a) . . . [T]he commissioner of social services, the commissioner of children and families or any child-caring institution or agency approved by the commissioner of children and families, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the superior court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, except as otherwise provided in subsection (e) of section 17a-112, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 46b-128, and said court shall further give notice to the petitioner and to the commissioner of children and families of the time and place when the

judgment for purposes of appeal. The respondent father, Genero F.,[3] argues that the trial court improperly issued temporary custody orders and that he was entitled to "postpone" his appeal of those temporary orders until issuance of a final judgment terminating his parental rights. We disagree and conclude, as we did in *Madigan* v. *Madigan*, 224 Conn. 749, 757, 620 A.2d 1276 (1993), that "temporary custody orders are immediately appealable because an immediate appeal is the only reasonable method of ensuring that the important rights surrounding the parent-child relationship are adequately protected"; id.; and, further, that an immediate appeal is the only way to ensure the protection of the best interests of children. We conclude, therefore, that the respondent's collateral attack on the temporary custody order, after the order terminating parental rights

petition is to be heard not less than fourteen days next preceding the hearing in question.

"(b) If it appears from the allegations of the petition and other verified affirmations of fact accompanying the petition, or subsequent thereto, that there is reasonable cause to find that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare, the court shall either (1) issue an order to the parents or other person having responsibility for the care of the child or youth to show cause at such time as the court may designate why the court shall not vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing on the petition, or (2) vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing upon the petition which shall be held within ten days from the issuance of such order on the need for such temporary care and custody. The service of such orders may be made by any officer authorized by law to serve process, or by any probation officer appointed in accordance with section 46b-123, investigator from the department of administrative services, state police officer or indifferent person. The expense for any temporary care and custody shall be paid by the town in which such child or youth is at the time residing, and such town shall be reimbursed therefor by the town found liable for his support, except that where a state agency has filed a petition pursuant to the provisions of subsection (a) of this section, the agency shall pay such expense. . . ."

[3] There appears to be a discrepancy between the record and the briefs of the parties with respect to the spelling of the respondent's first name. In this opinion we have spelled his name as it was spelled in the record.

had been entered, is " 'a procedurally impermissible substitute for an appeal.' " *Joe's Pizza, Inc.* v. *Aetna Life & Casualty Co.*, 236 Conn. 863, 876, 675 A.2d 441 (1996). We therefore affirm the judgment of the Appellate Court dismissing the respondent's appeal.

The record of the proceedings below reveals the following facts and procedural history. The respondent is the father of Shamika F. and her three siblings, whose custody is at issue in this appeal.[4] The children's mother is not a party to this appeal. The respondent's family had a history with child protection services in the Bronx, New York, prior to moving to Connecticut in 1995. In 1995, the family became involved with the Connecticut department of children and families (department) after reports were received that the children were neglected and without parental supervision. Investigations conducted by the department disclosed that the respondent's four children lived in a dirty apartment where there was no food and no furniture. The youngest child was not toilet trained, but had no diapers and little clothing. The older children were scantily clad or wore clothes that did not fit. There was evidence that both parents used narcotics and that the respondent had, at one time, received psychiatric treatment at Hartford Hospital. In interviews with social workers, the children stated that their parents often left them alone while they went out to buy drugs. In December, 1995, the family left Connecticut without notifying the department. In January, 1996, when the social worker assigned to the case was unable to obtain a new address for the family, the case was closed.

In March, 1996, the department received reports that the family had returned to Connecticut, that the children were being neglected, and that they went to school

---

[4] We omit reference to the three siblings' names in order to protect their anonymity.

hungry or that they did not attend school at all. After receiving these reports, the department reopened the family's case file. Subsequent investigation determined that the family had in fact returned to Connecticut, that the children continued to live in conditions dangerous to their well-being, and that they again frequently were left without parental supervision. The situation was such that on March 29, 1996, a "ninety-six hour hold" on the children was granted to the commissioner of the department (commissioner) pending further investigation to determine neglect and to proceed on petitions for temporary custody.

In April, 1996, the commissioner filed neglect petitions as to Shamika F. and her three siblings pursuant to General Statutes (Rev. to 1995) § 46b-129 (a).[5] At the same time, the commissioner filed a petition for an ex parte order of temporary custody pursuant to § 46b-129 (b). The petition for temporary custody was granted on April 2, 1996, and a hearing was scheduled for April 12, 1996, as required by General Statutes (Rev. to 1995) § 46b-129 (b), to address the ex parte order. Both parents were served with a notice of the order and were present at the April 12, 1996 hearing, at which time they were advised of their rights and informed of the charges of neglect.[6] The respondent did not raise any jurisdictional challenges to the court's granting of the temporary custody orders at that time. On May 30, 1996, the respondent appeared, with counsel, at the hearing on the neglect petitions, and entered pro forma denials

[5] "Neglect" is defined in General Statutes § 46b-120 in the following manner: "(8) a child or youth may be found 'neglected' who (A) has been abandoned or (B) is being denied proper care and attention, physically, educationally, emotionally or morally or (C) is being permitted to live under conditions, circumstances or associations injurious to his well-being or (D) has been abused . . . ."

[6] During the initial proceedings, it was made known to the court that the respondent spoke mostly Spanish. A Spanish interpreter was provided when the respondent was present at any proceeding.

with respect to the charges of neglect. At that time, the children's mother requested that they remain in the commissioner's custody. The respondent neither objected to this request nor raised any jurisdictional challenge at the neglect proceedings. On June 28, 1996, the trial court found, by a fair preponderance of the evidence, that the children were being neglected by their parents.[7] Thereafter, the children were committed to the care and custody of the commissioner for a period of twelve months without objection from the parents.

At the same time as it made the neglect determination, the court imposed requirements on the parents in order to deal with the issues that were causing them to neglect their children. Extensive referrals to drug counseling providers and parenting classes were made for both parents, yet neither showed any dedication to, or progress from, the assistance available. In June, 1997, the commissioner filed a petition for a twelve month extension of the children's commitment to the department pursuant to General Statutes (Rev. to 1997) § 46b-129 (d).[8] Both parents were notified of the petition to extend

[7] We recognize this as the applicable standard of proof in neglect and temporary custody proceedings. See *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 263, 471 A.2d 1380 (1984) (standard of proof applicable to temporary custody and neglect proceedings pursuant to § 46b-129 [b] is fair preponderance of evidence).

[8] *General Statutes (Rev. to 1997) § 46b-129 (d) provides in relevant part:* "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the Commissioner of Children and Families for a maximum period of twelve months, unless such period is extended in accordance with the provisions of subsection (e) of this section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person found to be suitable and worthy of such responsibility by the court. The commissioner shall be the guardian of such child or youth for the duration of the commitment . . . . Said commissioner may place any child or youth so committed to him in a suitable foster home . . . provided a child shall not be placed outside the state except for good cause and unless the parents of such child are notified in advance of such placement and given an opportunity to be heard, or in

commitment and neither objected. The extension was granted, and the parents were given additional time for rehabilitation and reunification with their children. The children's mother, however, participated infrequently in the programs provided and made little or no progress. As late as March, 1998, she tested positive for heroin use. The respondent did not participate in any of the programs recommended by social workers and made available through the department. In March, 1998, the parents returned voluntarily to New York despite the children's placement in Connecticut foster homes while they were under the care and custody of the Connecticut department. As a result, the respondent and the children's mother missed at least three scheduled visits with their children in February and March, 1998.

a receiving home maintained and operated by the Commissioner of Children and Families. . . ."

General Statutes (Rev. to 1997) § 46b-129 (e) provides: "Ninety days before the expiration of each twelve-month commitment made in accordance with the provisions of subsection (d) of this section and each extension made pursuant to the provisions of this subsection, the Commissioner of Children and Families shall petition the court either to (1) revoke such commitment, in accordance with the provisions of subsection (g) of this section, or (2) terminate parental rights in accordance with the provisions of section 17a-112, or (3) extend the commitment beyond such twelve-month period on the ground that an extension is in the best interest of the child. The court shall give notice to the parent, parents or guardian and to the child or youth at least fourteen days prior to the hearing on such petition. Upon finding that an extension is in the best interest of the child, the court may extend the commitment for a period of twelve months. At such hearing the court shall determine the appropriateness of continued efforts to reunify the child or youth with his family. If the court finds that such efforts are not appropriate, the Department of Children and Families shall within sixty days of such finding either (A) file a petition for the termination of parental rights, (B) file a motion to revoke the commitment and vest the custody and guardianship of the child on a permanent or long-term basis in an appropriate individual or couple or (C) file a written permanency plan with the court for permanent or long-term foster care, which plan shall include an explanation of the reason that neither termination of parental rights nor custody and guardianship is appropriate for the child. The court shall promptly convene a hearing for the purpose of reviewing such written plan."

In April, 1998, pursuant to General Statutes (Rev. to 1997) § 17a-112,[9] the commissioner of the department filed petitions to terminate the parental rights of the

[9] General Statutes (Rev. to 1997) § 17a-112, entitled "Termination of parental rights of child committed to commissioner," provides in relevant part: "(a) In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in a pending or prior proceeding, or an attorney appointed by the Superior Court on its own motion . . . may petition the court for the termination of parental rights with reference to such child. The petition shall be in the form and contain the information set forth in subsection (b) of section 45a-715, and be subject to the provisions of subsection (c) of said section. If a petition indicates that either or both parents consent to the termination of their parental rights, or if at any time following the filing of a petition and before the entry of a decree, a parent consents to the termination of his parental rights, each consenting parent shall acknowledge such consent on a form promulgated by the Office of the Chief Court Administrator evidencing that the parent has voluntarily and knowingly consented to the termination of his parental rights. . . .

"(b) The Superior Court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant a petition for termination of parental rights based on consent filed pursuant to this section if it finds that (1) upon clear and convincing evidence, the termination is in the best interest of the child and (2) such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child. . . . Consent for the termination of the parental rights of one parent does not diminish the parental rights of the other parent of the child, nor does it relieve the other parent of the duty to support the child.

"(c) The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that over an extended period of time, which except as provided in subsection (d) of this section shall not be less than one year, provided such time limit shall not apply to subparagraph (e) of this subsection: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the

respondent and the children's mother on the grounds

belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; (C) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; (D) There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; or (E) the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families. . . .

"(e) Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person

of neglect, failure to rehabilitate and failure to comply with reunification efforts.[10] The parents were served with the petitions for termination and notified of the

or by the economic circumstances of the parent.

"(f) Any petition brought by the Commissioner of Children and Families to the Superior Court, pursuant to subsection (a) of section 46b-129, may be accompanied by or, upon motion by the petitioner, consolidated with a petition for termination of parental rights filed in accordance with this section with respect to such child. Notice of the hearing on such petitions shall be given in accordance with sections 45a-716 and 45a-717. The Superior Court, after hearing, in accordance with the provisions of subsection (b) or (c) of this section, may, in lieu of granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45a-717.

"(g) Nothing contained in this section and sections 17a-113, 45a-187, 45a-606, 45a-607, 45a-707 to 45a-709, inclusive, 45a-715 to 45a-718, inclusive, 45a-724, 45a-725, 45a-727, 45a-733, 45a-754 and 52-231a shall negate the right of the Commissioner of Children and Families to subsequently petition the Superior Court for revocation of a commitment of a child as to whom parental rights have been terminated in accordance with the provisions of this section. The Superior Court may appoint a statutory parent at any time after it has terminated parental rights if the petitioner so requests. . . .

"(j) The provisions of this section shall be liberally construed in the best interests of any child for whom a petition under this section has been filed."

[10] In December, 1998, the department submitted a "Social Study for Termination of Parental Rights" to the court. In that study, the department revealed facts and evidence to support its position in favor of terminating the parental rights of the respondent and the children's mother. When department social workers visited the family's apartment in Hartford, they discovered that there was very little furniture, no food and no gas for cooking. They also discovered that the children slept on dirty mattresses with no blankets, pillows or sheets, and that they were scantily clad. The youngest child did not have any diapers, and interviews with the children revealed that he went to the bathroom on the floor when necessary. This all occurred despite the approximately $1300 per month that the family received in aid to families with dependent children and disability benefits.

Interviews with the children revealed that they often were left alone when their parents went out to buy drugs, and that the money the family was given for food and other necessities often was spent on drugs. When questioned about their relationship with their parents, the children all seemed afraid of their father. One of the younger children had bruises on his arm consistent with someone grabbing him, and that same child testified that both his mother and his father hit him and his siblings with a belt. Shamika F. told social workers that her father received treatment at a clinic for his mental problems. Social workers from the department determined collec-

hearing that would take place on May 21, 1998. Neither parent was present on that date. Instead, counsel for the respondent argued, pursuant to a motion for in-court review, that the court should consider transferring the case to the New York state child protection agency under the Interstate Compact on the Placement of Children.[11] The court denied the motion, noting that "more delay and disruption" was not in the best interest of the children in light of the fact that all of them were well established in the Connecticut foster care system. A transfer to New York would require that state's child protection agency to restart the process and uproot the children.[12]

In June, 1998, during the pendency of the termination petition, the commissioner again filed a petition for a twelve month extension of the children's commitment

tively that the children were in immediate danger from their surroundings, and that they should be removed immediately from the care and custody of their parents.

[11] General Statutes § 17a-175 provides in relevant part: "The Interstate Compact on the Placement of Children is hereby enacted into law and entered into with all other jurisdictions legally joining therein in form substantially as follows:

"INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN
"ARTICLE I. Purpose and Policy

"It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that:

"(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

"(b) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

"(c) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

"(d) Appropriate jurisdictional arrangements for the care of children will be promoted. . . ."

[12] The court's decision on the respondent's transfer motion is not a certified issue in this appeal.

to the department pursuant to General Statutes (Rev. to 1997) § 46b-129 (d), which the court granted. Both parents were notified that the commissioner was seeking another extension of the children's commitment. There is no evidence in the record that the respondent challenged the extensions of temporary custody despite his presence at the hearings. From March, 1998, until the termination of parental rights proceedings in 1999, the parents had few visits with their children. The children have continued to reside in foster homes since their placement in June, 1996.[13] Notably, according to social workers, the children showed little attachment to their biological parents and rarely spoke of them.

In January, 1999, prior to the trial on the termination petitions, the respondent again challenged Connecticut's jurisdiction over the matter, filing a "Motion for Order Disowning or Declining Subject Matter Jurisdiction." In his supporting memorandum of law, the respondent made several arguments refuting Connecticut's jurisdiction. First, he argued that the commissioner was infringing upon his constitutionally protected "right to travel," because the department's custody of his children forced him to remain in Connecticut despite the availability of better job opportunities and more family support in New York. Second, he argued that, according to the Uniform Child Custody Jurisdiction Act (act); see General Statutes (Rev. to 1999) § 46b-90 et seq.;[14] New York, not Connecticut, was

---

[13] Shamika F. and her sister have done well in the foster homes in which they have been placed since 1996. They were in the same foster homes at the time of the termination proceedings, and their foster parents wished to adopt them should it become possible. Shamika F.'s two younger brothers have had problems, however. They have been placed together in at least seven different foster homes. Both boys suffer from serious psychological and behavioral problems. At the time of the termination proceedings, however, they seemed to be in a stable and potentially permanent foster care situation.

[14] General Statutes (Rev. to 1999) § 46b-91 (a) provides: "The general purposes of this chapter are to: (1) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have

the home state of Shamika F. and her siblings. Citing General Statutes (Rev. to 1999) § 46b-91 (a) (3), the respondent claimed that the family had a closer connection with New York than Connecticut, and that they had not lived in Connecticut for six consecutive months prior to the commencement of the original neglect proceedings.[15] Finally, the respondent argued that the commissioner "is not, and cannot be, 'a parent or person acting as parent,' within contemplation of the [act]."[16]

in the past resulted in the shifting of children from state to state with harmful effects on their well-being; (2) promote cooperation with the courts of other states to the end that a custody decree is rendered in a state which can best decide the case in the interest of the child; (3) assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state; (4) discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child; (5) deter abductions and other unilateral removals of children undertaken to obtain custody awards; (6) avoid relitigation of custody decisions of other states in this state insofar as feasible; (7) facilitate the enforcement of custody decrees of other states; (8) promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child; and (9) make uniform the laws of the states which enact The Uniform Child Custody Jurisdiction Act." Number 99-185, § 39, of the 1999 Public Acts repealed General Statutes §§ 46b-90 through 46b-114 effective July 1, 2000.

[15] The respondent's contention that the family did not live in Connecticut for at least six months prior to the commencement of the proceedings is based on an erroneous calculation starting with the original date on which the commissioner obtained temporary custody of the children in April, 1996. Because termination proceedings are separate from temporary custody and neglect proceedings, however, the commencement of proceedings for purposes of the act is the date of the commissioner's filing of the petition for termination of parental rights. In this case, that date is April, 1998, and the children clearly have resided in Connecticut for at least six months prior to that date.

[16] The fact that the children were adjudicated neglected and placed under the care and custody of the commissioner according to § 46b-129 (a) defeats the respondent's argument that the commissioner is not a "parent or person acting as a parent" according to the definitions in General Statutes § 17a-

Citing the act as adopted by Connecticut and other states, the commissioner opposed the respondent's motion on the grounds that: (1) Connecticut had been the children's home state since at least 1996; (2) adjudication in Connecticut was in the best interest of the children because of the family's substantial connection to the state; and (3) the children needed to be removed from an emergency situation in Connecticut, giving the department in Connecticut original jurisdiction under § 46b-129 (b). Furthermore, the commissioner argued that, despite the Superior Court's power to decline jurisdiction where doing so would be in the best interests of the children; see General Statutes (Rev. to 1999) § 46b-97; such action would not be prudent in this case because of the children's significant connection to Connecticut and to their Connecticut foster parents. It was also the commissioner's position that, because termination proceedings were separate from neglect proceedings, the children had lived in Connecticut for more than six months before the filing of the termination petitions. In fact, the children had been living in Connecticut since at least 1996 when they were first adjudicated as neglected and placed in the care and custody of the commissioner.[17]

---

93. Subsection (f) of § 17a-93 provides that " '[s]tatutory parent' means the Commissioner of Children and Families or that child-placing agency appointed by the court for the purpose of giving a minor child or minor children in adoption"; subsection (g) provides that a " '[c]hild-placing agency' means any agency within or without the state of Connecticut licensed or approved by the Commissioner of Children and Families in accordance with sections 17a-149 and 17a-151, and in accordance with such standards which shall be established by regulations of the Department of Children and Families"; and subsection (i) provides that " '[p]rotective supervision' means a status created by court order following adjudication of neglect whereby a child's place of abode is not changed but assistance directed at correcting the neglect is provided at the request of the court through the Department of Children and Families or such other social agency as the court may specify . . . ."

[17] The court waived the one year residency requirement at that time because it found that the emergency situation in which the department found the children warranted an immediate removal from the care of the parents.

At a hearing on the jurisdictional issue held on January 11, 1999, the court agreed with the commissioner and denied the respondent's motion, concluding that Connecticut had jurisdiction over the matter based on the facts that (1) there were no proceedings pending in New York; (2) the children had been in Connecticut foster care since being adjudicated neglected in 1996 and ordered into the custody of the department; (3) all of the children's caregivers since 1996 were located in Connecticut; and (4) the only connection the family had to New York was the parents' voluntary relocation there in 1998, despite the children's establishment in Connecticut foster homes. On the basis of these determinations, the court found that it was in the best interest of the children "that they not be up and moved simply to make accommodations to the present residence of the parents in New York."[18]

On February 8, 1999, a hearing was conducted to determine whether parental rights should be terminated. At the hearing, several witnesses testified regarding the parents' neglect of the children, the alleged physical, sexual and substance abuse that took place in the home, and the negative psychological effect the parents had on their children. Social workers from the department testified to the fact that the parents did not take advantage of the rehabilitation programs offered to them. In its memorandum of decision dated February 26, 1999, the trial court found by clear and convincing evidence that the parents of Shamika F. and her siblings had failed to rehabilitate themselves in order to reunify their family despite the department's reasonable efforts

[18] As previously noted, the respondent's claims with respect to Connecticut jurisdiction are not within the certified question. We agree with the trial court, however, that Connecticut has had jurisdiction throughout the course of these proceedings.

to facilitate such rehabilitation and reunification.[19] The trial court concluded that as of April 23, 1998, neither parent had complied with the requirements of any assigned rehabilitation program and that, because of their behavior, they had denied the children the care, guidance or control necessary for their physical, educational or emotional well-being. In accordance with § 17a-112; see footnote 9 of this opinion; therefore, the court concluded that: (1) both the respondent and the children's mother had abandoned their children; and (2) neither parent had achieved a degree of personal rehabilitation that would encourage the belief that they could assume a responsible position in their children's lives. As a result, an order terminating parental rights was entered on February 26, 1999.

In his appeal to the Appellate Court, the respondent challenged the trial court's decision to terminate his parental rights to his four minor children. He based his challenge, however, on alleged jurisdictional errors committed by the court in the 1996 temporary custody proceedings, rather than on any alleged error committed in the course of the termination proceedings. In a motion to dismiss the appeal, the commissioner argued that, because the neglect and temporary custody proceedings were separate and distinct from the termination proceedings, the respondent's appeal raised an impermissible collateral attack on a previous final judgment in a prior proceeding. First, the commissioner asserted that the respondent's appeal was barred on

---

[19] In its adjudicatory findings, the trial court noted: "While the facts supporting the ground of abandonment were not obviously in existence for a year prior to the filing of the termination petitions and [the department] did not then so allege, the allegation having been added by amendment close to trial, the court finds it is in the best interests of the children that the one year requirement be waived and it is so ordered." This holding is not the subject of this appeal, for it relates to the termination petitions, rather than those for neglect and temporary custody. For the text of General Statutes (Rev. to 1997) § 17a-112, see footnote 9 of this opinion.

timeliness grounds because he was raising claims of error in a proceeding that took place three years earlier, in violation of Practice Book § 63-1 (a), which provides that "an appeal must be filed within twenty days of the date notice of the judgment or decision is given. . . ." Second, the commissioner argued that "[a] collateral attack on a judgment [in a prior, separate proceeding] is a procedurally impermissible substitute for an appeal." (Internal quotation marks omitted.) *Joe's Pizza, Inc.* v. *Aetna Life & Casualty Co.*, supra, 236 Conn. 876.

In his opposition to the motion to dismiss, the respondent argued that termination of his parental rights was a final judgment from both the initial neglect and temporary custody proceedings *and* the termination proceedings, and that any appeal prior to that would have been premature and dismissed as interlocutory. This, he argued, was because the two proceedings are both part of a collective decision regarding parental rights, and are not separate and distinct. Therefore, he claimed that challenging the temporary orders was not a collateral attack on a previous judgment. Finally, he argued that even if his claims were held to be collateral attacks on the neglect and temporary custody proceedings, they should not be barred because his challenge to the temporary custody orders was grounded in the trial court's lack of subject matter jurisdiction, and he may appeal that issue at any time. See *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 363, 488 A.2d 790 (1985) (question of subject matter jurisdiction may be raised at any time in proceedings). Finding no merit in the respondent's arguments, the Appellate Court granted the commissioner's motion to dismiss, and the respondent petitioned this court for certification to appeal pursuant to Practice Book § 84-1.[20] We granted certification to

---

[20] Practice Book § 84-1 provides: "An appeal may be taken to the supreme court upon the final determination of an appeal in the appellate court where the supreme court, upon petition of an aggrieved party, certifies the case for review."

appeal limited to the following question: "Is an order of temporary custody a final judgment for purposes of appeal or must any such appeal wait until an order of termination of parental rights is entered in the matter?" *In re Shamika F.*, 252 Conn. 940, 757 A.2d 2 (2000).

"The right of appeal is purely statutory [and stems from General Statutes § 52-263]. It is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met." (Internal quotation marks omitted.) *State* v. *Curcio*, 191 Conn. 27, 30, 463 A.2d 566 (1983).[21] Not only must the appellant be aggrieved by the decision of the court, but the appeal must be taken from a final judgment of the court. "Because our jurisdiction over appeals, both criminal and civil, is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim." Id., and cases cited therein. General Statutes § 46b-142 (b), regarding juvenile matters, provides in relevant part: "The Department of Children and Families, or any party at interest aggrieved by any *final judgment* or order of the court, may appeal to the Appellate Court in accordance with the provisions of section 52-263. . . ." (Emphasis added.) Thus, it is important for us to determine initially whether the determinations made regarding neglect and temporary custody were final for purposes of appeal.

In general, we recognize the statutory principle that appellate jurisdiction is limited to appeals from final

---

[21] General Statutes § 52-263 provides in relevant part: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge . . . ."

judgments. We also recognize, however, that there is a "gray area" between those judgments "which are undoubtedly final and others that are clearly interlocutory and not appealable." (Internal quotation marks omitted.) *Madigan* v. *Madigan,* supra, 224 Conn. 753, quoting *E. J. Hansen Elevator, Inc.* v. *Stoll,* 167 Conn. 623, 627, 356 A.2d 893 (1975). The *Curcio* rule provides that "[a]n otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." *State* v. *Curcio,* supra, 191 Conn. 31.[22] Thus,

---

[22] Because we determine that an order of temporary custody is a final judgment on the basis of its effect on the rights of the respondent, we need not decide whether it would merit immediate appeal under the first *Curcio* test, as a " 'separate and distinct proceeding . . . .' " *Madigan* v. *Madigan,* supra, 224 Conn. 753. To the extent that both parties relied on the first prong of the *Curcio* test in their briefs, however, we will address briefly the "separate and distinct proceedings" issue. In *In re Juvenile Appeal (84-AB),* 192 Conn. 254, 471 A.2d 1380 (1984), the parents appealed to this court from two separate judgments after their minor child was adjudicated neglected and their parental rights were terminated. The parents claimed that the trial court erred in using "fair preponderance of [the] evidence" as the standard of proof in the adjudicatory phase of the proceedings and in changing the standard of proof between the adjudicatory phase and the dispositive phase of the proceedings. Id., 257–58. We affirmed the trial court's judgment. Id. We concluded that a "fair preponderance of the evidence" is the proper standard of proof for a neglect petition because "any deprivation of rights [at that stage] is reviewable and nonpermanent" and, thus, warrants a slightly less exacting standard of proof. Id., 264–65. "While [however] a finding of neglect, resulting in non-permanent custody, may be proved by a fair preponderance of the evidence, all of the elements of the termination of parental rights petition [as set forth in General Statutes § 45a-717 (g) (1) and (2), formerly § 45-61f] must be proved by clear and convincing evidence." Id., 266. Our rationale for using two different standards was that "[w]hile an adjudication of neglect may lead to removal of a child from parental custody pending investigation and resolution of the child's circumstances, removal [or termination of parental rights] is only one of a number of possible dispositions after a finding of neglect." Id., 263. We concluded, therefore, that a "petition for neglect and [a] petition to terminate parental rights are separate and distinct petitions . . . [each with] its own specific requirements." (Citations omitted.) Id., 261–62. This supports our conclusion

there have been occasions "[i]n both criminal and civil cases, [in which] we have determined certain interlocutory orders and rulings of the Superior Court to be final judgments for purposes of appeal." Id. "We note the existence of a narrow category of cases in which certain temporary orders have been held to be appealable final judgments because they so conclude the rights of a party that further proceedings could not affect them. See, e.g., *Goodson* v. *State*, 228 Conn. 106, 114, 635 A.2d 285 (1993) (order of reinstatement to employment pending arbitration); *Madigan* v. *Madigan*, [supra, 755] (temporary custody order in dissolution case); *Litvaitis* v. *Litvaitis*, 162 Conn. 540, 548, 295 A.2d 519 (1972) (temporary order of child support in dissolution case); *Hiss* v. *Hiss*, 135 Conn. 333, 336, 64 A.2d 173 (1949) (pendente lite order of support in equitable action for support)." (Internal quotation marks omitted.) *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 230 Conn. 441, 451, 645 A.2d 978 (1994).

In *Madigan* v. *Madigan*, supra, 224 Conn. 753–54, we applied the *Curcio* standard to determine whether, in the context of a dissolution case, an order of temporary custody was a final judgment for purposes of appeal. In that case, temporary custody orders were entered in favor of the defendant wife during the pendency of a dissolution proceeding in the Superior Court. Id., 750–51. The plaintiff husband appealed from the temporary custody orders on the grounds that they would interfere with his right to spend significant time with his child, and that such an opportunity "cannot be replaced by a subsequent order of custody as part of an ultimate dissolution judgment." Id., 756. The Appellate Court dismissed his appeal for lack of a final

that temporary custody orders are final judgments for purposes of appeal because (1) they are separate and distinct from the termination proceedings, and (2) they so conclude parents' rights to be free from interference with their family integrity that further proceedings cannot affect them.

judgment. Id., 752. We granted certification to appeal regarding the issue of the finality of the temporary custody order and reversed the Appellate Court's judgment. Id., 751.

Relying on the second prong of the *Curcio* test, we concluded in *Madigan* that "deny[ing] immediate relief to an aggrieved parent [would interfere] with the parent's custodial right over a significant period [of time] in a manner that [could not] be redressed by a later appeal." Id., 756. Even "a temporary custody order may have a significant impact on a subsequent permanent custody decision . . . [by] establish[ing] a foundation for a stable long-term relationship that becomes an important factor in determining what final custodial arrangements are in the best interests of the child." Id., 756–57; see General Statutes § 46b-56. We concluded that temporary custody orders did "so [conclude] the rights of the parties that further proceedings [could not] affect them"; *State* v. *Curcio*, supra, 191 Conn. 31; and, therefore, they were final for purposes of appeal. Following *Madigan*, we subsequently also have held that a one year ban on custody and visitation motions imposed by a court to prevent parents involved in a custody dispute from filing further motions is a final judgment for purposes of appeal because it had the potential to interfere seriously with the parent-child relationship. See *Taff* v. *Bettcher*, 243 Conn. 380, 386–87, 703 A.2d 759 (1997).

The considerations that led us to our conclusions in *Madigan* and *Taff* also apply here to the extent that "courts and state agencies must keep in mind the constitutional limitations imposed [upon them when they undertake] any form of coercive intervention in family affairs . . . [which includes] the right of the family to remain together without the . . . interference of the awesome power of the state." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal*

*(83-CD)*, 189 Conn. 276, 284, 455 A.2d 1313 (1983). Thus, we consider orders of temporary custody in light of these constitutional considerations and reaffirm our conclusion that "an immediate appeal of [a court order of temporary custody] is the only reasonable method of ensuring that the important rights surrounding the parent-child relationship are adequately protected." (Internal quotation marks omitted.) *Taff* v. *Bettcher*, supra, 243 Conn. 387, quoting *Madigan* v. *Madigan*, supra, 224 Conn. 757.[23] As we pointed out in *Madigan*, several of our sister states have come to the same conclusion. See *Madigan* v. *Madigan*, supra, 757 n.9.[24]

---

[23] In *Madigan*, we compared temporary orders for alimony and support to temporary custody orders in order to draw our analogy. See *Hiss* v. *Hiss*, supra, 135 Conn. 336–37 (temporary orders for alimony and support immediately appealable). We found temporary orders of alimony and support to be " 'final' " because "once paid by one spouse to another, such sums could not subsequently be recovered on appeal from the final dissolution judgment." *Madigan* v. *Madigan*, supra, 224 Conn. 755. "This reasoning applies with equal force to temporary custody orders that affect the irreplaceable time and relationship shared between parent and child. It would be anomalous, therefore, to permit the appealability of otherwise nonreviewable orders relating to financial matters and to deny the appealability of orders relating to the personal interaction between a parent and a child." Id.

[24] "An inquiry into the law of other jurisdictions supports our conclusion that temporary custody orders are immediately appealable. Although a number of jurisdictions have held that such orders are not immediately appealable, emphasizing the broad rule that interlocutory orders must await the end of an action to be appealed; see, e.g., *Chancellor* v. *Chancellor*, 282 Ark. 227, 230, 667 S.W.2d 950 (1984); *In re Temporary Custody of Five Minors*, 105 Nev. 441, 443, 777 P.2d 901 (1989); *Craft* v. *Craft*, 579 S.W.2d 506, 508 (Tex. App. 1979); others recognize that temporary orders may be appealed pursuant to local rules recognizing interlocutory appeals. See, e.g., *Sanchez* v. *Walker County Dept. of Family & Children Services*, 235 Ga. 817, 818, 221 S.E.2d 589 (1976); *In re Marriage of Kitchen*, 126 Ill. App. 3d 192, 194–95, 467 N.E.2d 344 (1984). Likewise, a limited number of jurisdictions recognize temporary custody orders as final for the purpose of immediate appeal. See, e.g., *In re Interests of L. W.*, 241 Neb. 84, [95–96, 486 N.W.2d 486] (1992); *In re Murray*, 52 Ohio St. 3d 155, 159–61, 556 N.E.2d 1169 (1990). On balance, we find that the rationale for allowing immediate appeals adopted in the latter jurisdictions, in conjunction with the practice in other jurisdictions that allow these appeals by special interlocutory appeals rules, to be more persuasive than the traditional reasons of judicial economy generally offered

Accordingly, we conclude that, in order to protect the parent's interest in retaining custody of the child, an order of temporary custody is a final judgment for purposes of appeal. That reasoning means, moreover, that any party with standing to challenge that order by appeal must do so at that time.

In this case, moreover, the best interest of the children, especially their interest in family stability, supports our analysis. When a parent has spent three years neglecting to challenge the temporary removal of his children from his custody, the children's strong interest in stability counsels firmly against allowing a belated appellate challenge to that temporary order. When the extensions to the temporary custody orders were granted in both 1997 and 1998, the separation of the children from their parents was approved for a period extending to almost three years. During that time, Shamika F. and her siblings all were establishing themselves in the Connecticut foster care system and attempting to achieve a degree of stability with their foster families. As we pointed out in *Madigan*, spending a significant amount of time in foster care has the potential to "establish a foundation for a stable long-term relationship that becomes an important factor in determining what final custodial arrangements are in the best interest of the [children]." Id., 757. Thus, the second prong of the *Curcio* "final judgment" test requires an immediate appeal of those judgments that have an irreversible effect on important familial relationships in order to protect the interests of the parties involved. Neglecting to appeal the removal of the children in a timely fashion also can affect the interests of the children. Therefore, we conclude that temporary custody orders are immediately appealable not only to protect a parent's interests

as a justification to adhere to a rule of nonappealability." *Madigan* v. *Madigan*, supra, 224 Conn. 757 n.9.

in their children, but also to protect the individual interests of the children.

Accordingly, such appeals are obligatory so that parents may act in the best interest of their children. A grave injustice would be committed against children if a parent were permitted to appeal from a judgment of temporary custody long after they had established a stable relationship with foster parents. We therefore protect the best interest of the children by requiring parents immediately to appeal decisions that, as here, interfere substantially with their family integrity. Those parents must do so in a timely fashion not only to protect themselves, but also to protect the children. Appealing from a temporary custody order after allowing children to languish in foster care for three years does nothing for family integrity. To the contrary, it would interfere seriously with their ability to experience any kind of family stability with either a biological or a foster family, even in situations where parents have demonstrated a total lack of interest in reunifying the family. We, therefore, limit a parent's right to attack collaterally a temporary custody order in order to avoid further disruption of the lives of neglected children. By doing so, not only are we protecting the parent-child relationship, but we are also protecting the important interests of the children.

"The reason for the rule against collateral attack is well stated in these words: The law aims to invest judicial transactions with the utmost permanency consistent with justice. . . . Public policy requires that a term be put to litigation and that judgments, as solemn records upon which valuable rights rest, should not lightly be disturbed or overthrown. . . . [T]he law has established appropriate proceedings to which a judgment party may always resort when he deems himself wronged by the court's decision. . . . If he omits or neglects to test the soundness of the judgment by these

or other direct methods available for that purpose, he is in no position to urge its defective or erroneous character when it is pleaded or produced in evidence against him in subsequent proceedings. Unless it is entirely invalid and that fact is disclosed by an inspection of the record itself the judgment is invulnerable to indirect assaults upon it." (Internal quotation marks omitted.) *Lampson Lumber Co.* v. *Hoer*, 139 Conn. 294, 297–98, 93 A.2d 143 (1952), quoting 1 A. Freeman, Judgments (5th Ed. 1925) § 305, pp. 602–603. Although public policy in Connecticut favors the protection of the integrity of the family, there is also a strong public policy in favor of protecting the best interest of our children. It is in the best interest of children, especially those growing up in situations of neglect, that the state provide them with a stable family life to the extent that it is able to do so. The commissioner and the department seek to do this through our state foster care system. Allowing a collateral attack three years into that effort would undermine the purpose of the collateral attack rule as well as the goal of our state agencies in protecting the neglected children of Connecticut.

The respondent had three years, and several in-court hearings, during which he could have challenged the temporary custody orders that led to the temporary removal of his children. Even when the trial court denied or dismissed his jurisdictional challenges, the respondent failed to appeal. Although we are not suggesting that any challenge would have succeeded, his failure to act at the time the temporary custody orders were entered does not give him a right at this late date to launch a collateral attack on the neglect and temporary custody proceedings. See *In re Jessica S.*, 51 Conn. App. 667, 671 and n.4, 723 A.2d 356, cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999). "Unless a litigant can show an absence of subject matter jurisdiction that makes the prior judgment of a tribunal entirely

invalid, he or she must resort to direct proceedings to correct perceived wrongs . . . . A collateral attack on a judgment is a procedurally impermissible substitute for an appeal." (Citation omitted; internal quotation marks omitted.) *Joe's Pizza, Inc.* v. *Aetna Life & Casualty Co.*, supra, 236 Conn. 876. "[A]t least where the lack of jurisdiction is not entirely obvious, the critical considerations are whether the complaining party had the opportunity to litigate the question of jurisdiction in the original action, and, if he did have such an opportunity, whether there are strong policy reasons for giving him a second opportunity to do so." (Internal quotation marks omitted.) *Upjohn Co.* v. *Zoning Board of Appeals*, 224 Conn. 96, 104, 616 A.2d 793 (1992).

We see no reason to give the respondent a second opportunity to litigate the issue of temporary custody or Connecticut's jurisdiction with respect to the proceedings related thereto. He had a fair chance to do so at the time of the neglect and temporary custody proceedings, and he failed to act. Although we note that we previously have held that a collateral attack may be appropriate when the trial court's lack of jurisdiction was obvious, we conclude in this case that "[t]he lack of jurisdiction, if any, was far from obvious . . . ." Id.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.