******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE PAUL M., JR.*
(AC 35856)

DiPentima, C. J., and Alvord and Bear, Js.

*Argued January 7—officially released February 26, 2014***

(Appeal from Superior Court, judicial district of New Haven, Juvenile Matters, Brown, J.)

*Michael D. Day*, assigned counsel, for the appellant (respondent father).

*Susan T. Pearlman*, assistant attorney general, with whom were *Benjamin Zivyon*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellee (petitioner).

*Peter K. Manko*, for the minor child.

*Opinion*

DiPENTIMA, C. J. The respondent father appeals from the granting of the motion to cease reunification efforts filed by the petitioner, the Commissioner of Children and Families. The respondent's sole claim on appeal is that the court's finding that he had abandoned his minor child, Paul M., Jr., was clearly erroneous. We disagree, and, accordingly, affirm the judgment of the trial court.

On June 10, 2013, the petitioner filed a motion to cease reunification efforts pursuant to General Statutes § 17a-111b (b). In the motion, the petitioner alleged that the respondent "had subjected the [Paul M., Jr.] to the aggrieved circumstances of abandonment as defined in subsection (j) of [General Statutes] § 17a-112. The [respondent] abandoned the child at the home of an acquaintance on or about January 8, 2013, and reportedly fled the jurisdiction to avoid prosecution regarding the violation of the conditions of his probation. [The respondent] was recently picked up on the outstanding warrant in Lake George, New York, and returned to Connecticut to face his outstanding charges. He did not return voluntarily, nor did he contact [the Department of Children and Families (department)] at any time to inquire as to the well-being of his child during his absence."

On June 24, 2013, the court held a hearing on the petitioner's motion[1] and heard testimony from three witnesses. Patricia Belin, a probation officer in the Intensive Sex Offender Unit, testified that she had supervised the respondent for the past two years.[2] The conditions of the respondent's probation included no contact with minors under the age of sixteen other than Paul M., Jr. (child), who was born in 2010, and that he refrain from consuming alcohol or using a computer to access pornographic websites, dating websites or any social networking on the Internet. Belin stated that she made a referral to the department on December 28, 2012, after receiving information from the New Haven and Meriden Police Departments that the respondent was violating his probation by being with his other son, a fifteen year old, and being under the influence of alcohol. Belin also learned that the respondent had attempted to walk home from Meriden to New Haven after 11 p.m. with the child and while under the influence of alcohol. Belin also indicated that she had received information that the respondent was using his computer in violation of his conditions of probation, and that police had been to his home for domestic issues. As a result of these events, Belin was pursuing the possibility of submitting a warrant for his arrest for violating his probation. Belin also attempted to visit the respondent at his home, when she learned that the respondent had fled with the child on January 4, 2013.[3]

In an effort to locate the respondent, who has a history of mental health issues, and the child, Belin spoke with multiple family members. Additionally, a "Silver Alert"[4] was issued, which resulted in further information to assist in locating the respondent. The respondent telephoned Belin and stated that he was aware of the arrest warrant and that he was not taking his medication for his mental health issues. On January 9, 2013, the respondent stated that the child was located in Ansonia, and members of the New Haven Police Department retrieved him after finding him in a malnourished, dehydrated and disoriented state. The child was placed in a foster home. The respondent refused requests from the police to turn himself in.

Belin testified that the respondent was taken into custody in Lake George, New York, on May 29, 2013. During the time period from January 9, 2013 to May 29, 2013, she received one communication from the respondent and he did not inquire about the well-being of the child.

Julie Dixon, a social worker employed by the department, also testified at the hearing and stated that she became involved with this child on January 28, 2013. She stated that the respondent telephoned her in March and told her that he was in violation of his probation and that he had not been taking his medication. According to Dixon, the respondent did not ask about the welfare of the child, and the child did not receive any cards, gifts, or financial support from the respondent. Following his arrest, the respondent called Dixon on June 3, 2013, and requested to visit with the child.

The respondent also testified at the evidentiary hearing and asserted that he was the sole legal guardian and custodian of the child. He claimed that the child's maternal grandmother and a female friend had kept him apprised of the child's well-being. He also disputed Dixon's testimony and stated that he had asked Dixon about the child. The respondent informed the court that he had lacked the financial resources to send any type of card, letter or gift to the child during his absence from Connecticut.

At the conclusion of the hearing, the court found that the respondent had absconded from Connecticut during the time period of early January to late May, 2013, and that he failed to provide any information as to how he could be reached. The court further found that any sporadic showing of an indicia of interest in the child did not amount to a continuing or maintained degree of interest as required by §§ 17a-111b (a) and 17a-112 (j) and case law. Ultimately, the court found, by clear and convincing evidence, that the respondent had not maintained a reasonable degree of responsibility as to the welfare of the child. Accordingly, it granted the petitioner's motion to cease reunification efforts.[5] This

appeal followed.[6]

I

As a threshold matter, we must decide, sua sponte,[7] whether the granting of a motion to cease reunification constitutes a final judgment in order to determine whether we have jurisdiction to review the merits of the respondent's appeal. See *Putman* v. *Kennedy*, 279 Conn. 162, 167–68 n.9, 900 A.2d 1256 (2006); *Sullivan* v. *Brown*, 116 Conn. App. 660, 661–62, 975 A.2d 1289, cert. denied, 294 Conn. 914, 983 A.2d 852 (2009). We conclude that the granting of such a motion constitutes a final judgment for purposes of an appeal because it satisfies the second prong of the test set forth in *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983).

"The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding . . . subject matter jurisdiction is a question of law . . . . The jurisdiction of the appellate courts is restricted to appeals from judgments that are final. . . . The policy concerns underlying the final judgment rule are to discourage piecemeal appeals and to facilitate the speedy and orderly disposition of cases at the trial court level. . . . The appellate courts have a duty to dismiss, even on [their] own initiative, any appeal that [they lack] jurisdiction to hear." (Citations omitted; internal quotation marks omitted.) *DeCorso* v. *Calderaro*, 118 Conn. App. 617, 624, 985 A.2d 349 (2009), cert. denied, 295 Conn. 919, 991 A.2d 564 (2010); see also *State* v. *Fielding*, 296 Conn. 26, 35–36, 994 A.2d 96 (2010).

Our Supreme Court has stated that "the courts may deem interlocutory orders or rulings to have the attributes of a final judgment if they fit within either of the two prongs of the test set forth in *State* v. *Curcio*, [supra, 191 Conn. 31]. . . . Under *Curcio*, the landmark case in the refinement of final judgment jurisprudence . . . interlocutory orders are immediately appealable if the order or ruling (1) terminates a separate and distinct proceeding or (2) so concludes the rights of the parties that further proceedings cannot affect them." (Citations omitted; internal quotation marks omitted.) *Abreu* v. *Leone*, 291 Conn. 332, 338–39, 968 A.2d 385 (2009); see *Brown & Brown, Inc.* v. *Blumenthal*, 288 Conn. 646, 652–53, 954 A.2d 816 (2008); see also *Madigan* v. *Madigan*, 224 Conn. 749, 753, 620 A.2d 1276 (1993) (*Curcio* provides standard to evaluate judgments that lie in grey area between those that are undoubtedly final and those that are clearly interlocutory).

We also are mindful that our Supreme Court has acknowledged the unique place that family court proceedings hold in our jurisprudence. "This court has a long history of concluding that, within the context of family matters, orders that would otherwise be considered interlocutory constitute appealable final judg-

ments. . . . Taken as a whole, these cases demonstrate that, [o]n balance, we [have been] more persuaded by the rationale for allowing an immediate appeal of . . . temporary . . . order[s] [in family matters] than by the traditional reasons of judicial economy that might otherwise have precluded [their] review. . . . Although some of the cases allowed an appeal in order to ensure that the important rights surrounding the parent-child relationship are adequately protected . . . others allowed an immediate appeal because the contempt order required the aggrieved party to engage in some coercive action, such as paying money that could not be recovered on a subsequent appeal." (Citations omitted; internal quotation marks omitted.) *Khan* v. *Hillyer*, 306 Conn. 205, 213–14, 49 A.3d 996 (2012).

We turn our inquiry to the applicable *Curcio* prong. "The second prong of the *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that right will be irretrievably lost and the [parties] irreparably harmed unless they may immediately appeal. . . . One must make at least a colorable claim that some recognized statutory or constitutional right is at risk. . . . Moreover, when a statute vests the trial court with discretion to determine if a particular [party] is to be accorded a certain status, the [party] may not invoke the rights that attend the status as a basis for claiming that the court's decision not to confer that status deprives the [party] of protections to which [it] is entitled. . . . The right itself must exist independently of the order from which the appeal is taken." (Citation omitted; internal quotation marks omitted.) *Abreu* v. *Leone*, supra, 291 Conn. 339–40; see also *State* v. *Fielding*, supra, 296 Conn. 37–38.

Section 17a-111b (a) provides in relevant part: "The [petitioner] shall make reasonable efforts to reunify a parent with a child . . . ." As a general matter, this statute entitles the respondent and the child to reasonable reunification efforts made by the petitioner until such efforts are no longer required as set forth in § 17a-111b (a) (1) and (2).[8] See, e.g., *In re Jorden R.*, 293 Conn. 539, 554, 979 A.2d 469 (2009) (§ 17a–112 [j] begins with presumptive obligation that department make reasonable reunification efforts, it later excuses this obligation in cases when trial court finds that parent is unable or unwilling to benefit from such efforts); *In re Albert M.*, 124 Conn. App. 561, 562, 6 A.3d 815 (to protect constitutional rights of parent to raise children, department required to make reasonable efforts to reunify child with parents prior to filing petition for termination of parental rights), cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010). That statutory right to receive services from the state to facilitate reunification was ended as a result of the granting of the petitioner's motion to cease reunification efforts pursuant to § 17a-111b (b)

(1) (A). The basis for ending reunification efforts by the petitioner was the court's finding, after the evidentiary hearing, that the respondent had abandoned his son. Abandonment is a ground for termination of parental rights set forth in § 17a-112 (j) (3) (A).[9] Thus, this ruling affects the respondent's parenting rights and may have a significant impact on subsequent related proceedings. See *In re Shamika F.*, 256 Conn. 383, 403, 773 A.2d 347 (2001); *Madigan* v. *Madigan*, supra, 224 Conn. 756–57. Thus, under the second *Curcio* prong, the court's ruling constitutes an appealable final judgment. See *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, 279 Conn. 220, 226–27, 901 A.2d 1164 (2006); *Rostad* v. *Hirsch*, 128 Conn. App. 119, 122–23, 15 A.3d 1176 (2011).

## II

The respondent's sole claim on appeal is that the court's finding of abandonment was clearly erroneous. His principal contention is that the period of 142 days he was away from his son is an insufficient time period to support a finding of abandonment. The petitioner counters that the relevant statutory scheme does not contain a minimum time period for abandonment and that the court's findings were not clearly erroneous. We agree with the petitioner.

We begin by setting forth the relevant legal principles and our standard of review. "A parent abandons a child if the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . General Statutes § 17a-112 (j) (3) (A). Abandonment focuses on the parent's conduct. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . Section 17a-112 [(j) (3) (A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) *In re Ilyssa G.*, 105 Conn. App. 41, 46–47, 936 A.2d 674 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008). We also have explained that "[t]he commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . . It is not lack of interest alone which is the criterion in determining abandonment. Abandonment . . . requires failure to maintain interest, concern or responsibility as to the welfare of the child. Attempts to achieve

contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child." (Internal quotation marks omitted.) *In re Drew R.*, 47 Conn. App. 124, 129, 702 A.2d 647 (1997); see also *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 14, 438 A.2d 801 (1981); *In re Migdalia M.*, 6 Conn. App. 194, 208–209, 504 A.2d 533 (1986).

The issue of parental abandonment presents a question of fact. See *In re Shane P.*, 58 Conn. App. 244, 250, 754 A.2d 169 (2000); see also *In re Drew R.*, supra, 47 Conn. App. 128; *In re Rayna M.*, 13 Conn. App. 23, 36, 534 A.2d 897 (1987). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of the trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Christopher B.*, 117 Conn. App. 773, 780–81, 980 A.2d 961 (2009); see also *In re S.D.*, 115 Conn. App. 111, 116–17, 972 A.2d 258 (2009).

The trial court appropriately focused on the period of time between early January, 2013, and late May, 2013, when the respondent absconded from Connecticut to avoid arrest for violating his probation. The court found that the respondent did not inform his friend with whom he left the child where he was or how to reach him. Thus, there was no way for this friend to communicate with the respondent, who was the child's sole legal guardian, to let him know of the child's needs or to obtain authorization to act on the child's behalf. The court further found that the respondent displayed only sporadic indicia of interest in the child and his needs that did not rise to the level of an appropriate degree of interest to avoid a finding of abandonment. Additionally, the court noted that the respondent never attempted to send a letter to the child to let him know that the respondent was "ok" and that he would contact the child when possible. We conclude these factors support the finding of abandonment.

We also reject the respondent's argument that the time period of 142 days that he had fled the jurisdiction is insufficient to find abandonment. As correctly noted by the petitioner, § 17a-111b (b) does not contain a minimum time frame pursuant to which abandonment

occurs as a matter of law. The respondent has not provided this court with any statute or case setting forth a temporal requirement that must be met before a finding of abandonment can be made. Finally, as noted previously in this opinion, the court's finding of abandonment was in accord with our precedent and not clearly erroneous. The respondent's time period argument, therefore, must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** February 26, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 17a-111b (b) provides in relevant part that "[t]he court shall hold an evidentiary hearing on the motion [to cease reunification efforts] not later than thirty days after the filing of the motion . . . ."

[2] Belin testified that she had observed the respondent with the child on numerous occasions and noticed that the respondent displayed a lot of frustration with parenting and that it was difficult for him to interact with the child. She also observed the child "wince" or "flinch" when the respondent would raise his voice.

[3] Belin testified that she was given access to the respondent's home after he had fled and found numerous cell phones that had not been approved by the Office of Probation.

[4] "The Silver Alert system does for missing persons with dementia and other cognitive impairments what the Amber Alert system does for missing children—it helps speed up the process of finding them. Specifically, the Silver Alert system applies to any missing person age 18 years or older who has a mental impairment or is 65 years of age or older. Both Amber Alert and Silver Alert systems create an emergency notification system for law enforcement agencies to broadcast local, regional, or statewide public alerts via radio, television and electronic highway signs. The Silver Alert system mandates that law enforcement immediately begin searching for missing individuals who are ages 65 or older, or ages 18 and over if mentally impaired. Once the police receive a missing person's report and a description of the missing person, the information is broadcast via radio, television, and electronic highway signs through the Emergency Alert System (EAS). The plan alerts the public as quickly as possible to the disappearance so everyone may assist in the search for the safe return of the individual." State of Connecticut, State Department on Aging, "Connecticut Silver Alert System—An Elderly And Or Mental Impairment Locator System," (last modified on December 5, 2011), available at http://www.ct.gov/agingservices/cwp/view.asp?Q=442724&A=2513 (last visited February 26, 2014) (copy contained in the file of this case in the Appellate Court clerks' office). The respondent had a history of mental illness.

[5] This court was not provided with a signed transcript of the court's decision as required by Practice Book § 64-1. On January 2, 2014, we issued the following order: "As the record does not reflect that the trial court had the opportunity to review the prepared transcript of its oral ruling in this case, the trial court . . . is sua sponte ordered to review and sign the June 24, 2013 transcript containing its decision in this case in accordance with [Practice Book] § 64-1." The court signed the transcript on January 3, 2014.

[6] In accordance with Practice Book § 67-13, the attorney for the minor child filed a statement with the court and adopted the brief of the petitioner.

[7] We note that even if the parties had agreed on the existence of a final judgment, such an agreement would not confer jurisdiction on this court. "The appellate courts have a duty to dismiss, even on [their] own initiative, any appeal that [they lack] jurisdiction to hear. . . . Neither the parties nor the trial court, however, can confer jurisdiction upon [an appellate] court. . . . The right of appeal is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met." (Internal quotation marks omitted.) *Brown & Brown, Inc.* v. *Blumenthal,* 288 Conn. 646, 654, 954 A.2d 816 (2008).

[8] General Statutes § 17a-111b (a) provides: "The Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court (1) determines that such efforts are not required pursuant to subsection (b) of this section or subsection (j) of section 17a-112, or (2) has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129."

[9] Proof of only one of the several grounds set forth in § 17a-112 (j) (3) is required for termination of parental rights. *In re Elvin G.*, 310 Conn. 485, 500, 78 A.3d 797 (2013).