******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE TEAGAN K.-O.*
(AC 44918)
(AC 44923)

Alexander, Suarez and Sheldon, Js.

*Syllabus*

The respondent parents filed separate appeals to this court from the judg-
ment of the trial court terminating their parental rights with respect to
their minor child, T. T was born in Florida, and the Florida Department
of Children and Families took emergency custody of T. While the respon-
dent mother was pregnant with T, the respondents moved to Florida in
order to avoid further involvement with the Connecticut Department
of Children and Families. The petitioner, the Commissioner of Children
and Families, filed a motion in Connecticut seeking temporary custody
of T and a petition seeking to adjudicate T neglected, which the trial
court denied on the ground that T was not in Connecticut. After a Florida
court ratified and adopted a magistrate's recommendation to transfer
jurisdiction to Connecticut, the trial court granted the petitioner's
renewed request for an ex parte order of temporary custody of T. The
court denied the respondent father's motion to dismiss the neglect peti-
tion on the ground of lack of subject matter jurisdiction, and the father
appealed. The petitioner subsequently filed a petition to terminate the
respondents' parental rights. Our Supreme Court in *In re Teagan K.-O.*
(335 Conn. 745) reversed the judgment of the trial court and remanded
the case with direction to grant the father's motion to dismiss the neglect
petition, concluding that the court lacked jurisdiction over that petition
because, when that petition was filed, T was not present in Connecticut.
Thereafter, the trial court dismissed the neglect petition. Subsequently,
the petitioner filed a motion for order in which she asked the court to find
that it had jurisdiction over T's case, including the pending termination
of parental rights petition, which the court granted. After concluding
that it had jurisdiction under the Uniform Child Custody Jurisdiction
and Enforcement Act (UCCJEA), the court consolidated for trial the
termination of parental rights petition with the father's motion seeking
to vacate the order of temporary custody. Following a trial, the court
rendered judgment terminating the respondent parents' parental rights
and denying the father's motion to vacate the order of temporary cus-
tody. *Held*:

1. This court declined to review the respondent mother's claim that the trial
court lacked the statutory authority to terminate her parental rights
because T was not in the custody of the petitioner, which was based
on her claim that the fact that our Supreme Court ordered that the
neglect petition be dismissed vitiated the predicate for the order of
temporary custody that had been granted to the petitioner pursuant to
statute (§ 46b-129): the mother's claim constituted an impermissible
collateral attack on the order of temporary custody as the mother did
not appeal from the order of temporary custody, which was a final
judgment for purposes of appeal, and the mother had a chance to litigate
any issue with respect to the order of temporary custody when it was
issued and when the neglect petition was dismissed, but failed to do so.

2. The respondent father's claim that the trial court lacked jurisdiction to
adjudicate the petition for termination of parental rights because the
order of temporary custody was not a final custody determination for
purposes of establishing jurisdiction under the UCCJEA, and because
there was no mechanism by which the order of temporary custody could
become a final custody determination, was unavailing: in adjudicating
the petitioner's motion for order, the court found that the order of
temporary custody was a final custody determination for the purposes
of jurisdiction under the UCCJEA, and determined that Connecticut
would retain jurisdiction over the case and would move forward in
adjudicating the termination of parental rights petition as the three
conditions required by statute (§ 46b-115n (b)) to make that determina-
tion were satisfied, namely, the father did not dispute that Connecticut
had become T's home state and that proceedings had not been instituted

in any other state, and the court explicitly determined that the order of temporary custody was a final child custody determination for the purposes of jurisdiction under the UCCJEA.

Argued February 15—officially released April 27, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights as to their minor child, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, and tried to the court, *Hoffman, J.*; judgment terminating the respondents' parental rights, from which the respondents filed separate appeals to this court. *Affirmed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant in Docket No. 44918 (respondent mother).

*Matthew C. Eagan*, for the appellant in Docket No. AC 44923 (respondent father).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee in both appeals (petitioner).

*Opinion*

SUAREZ, J. In these two appeals, the respondent parents appeal from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating their parental rights with respect to their minor child, Teagan K.-O. (Teagan). In Docket No. AC 44918, the respondent mother claims that the trial court lacked the statutory authority to terminate her parental rights under General Statutes § 17a-112 because Teagan was not in the custody of the petitioner pursuant to General Statutes § 46b-129. Specifically, she argues that the fact that our Supreme Court ordered that the neglect petition filed with respect to Teagan be dismissed vitiated the statutory predicate for the order of temporary custody over Teagan that had been granted to the petitioner under § 46b-129. In Docket No. AC 44923, the respondent father claims that the trial court lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), General Statutes § 46b-115 et seq., to adjudicate the petition for termination of parental rights because (1) the order of temporary custody was not a final custody determination for purposes of establishing jurisdiction under the UCCJEA, and (2) there is no mechanism by which the order of temporary custody could become a final custody determination. We affirm the judgment of the trial court.

The following facts and procedural history, which our Supreme Court recited in a prior appeal in this action, are relevant to our review of the present appeal. "The respondents, both raised in Connecticut, have a lengthy history of involvement with the Connecticut Department of Children and Families [(department)]. Each had been placed in the department's custody as a teenager due to various mental health issues. The respondents' involvement with the department continued after they had children.

"The respondent mother's first child, A, born in Connecticut in 2012, was conceived with someone other than the respondent father. In 2013, the department became involved with A due to concerns about the mother's mental health, her parenting ability, and domestic violence, as well as concerns about possible physical abuse of A. A was adjudicated neglected, and, thereafter, sole custody was awarded to A's father.

"The respondents subsequently had three children together; the first two children were born in Connecticut. Their first child, G, was removed from the respondents' custody within one month of his birth in 2015, in light of the mother's history and an incident of domestic violence in G's presence. Subsequently, G was adjudicated neglected and placed in the [petitioner's] custody. The respondents' second child, J, was removed from the respondents' custody immediately after his birth

in 2016, on the ground that the respondents had not addressed mental health and parenting issues. In March, 2017, J was adjudicated neglected and committed to the [petitioner's] custody. At that same time, the respondents' parental rights with respect to G were terminated.

"In April, 2018, the [petitioner] filed a petition seeking to terminate the respondents' parental rights with respect to J. The mother was then near full-term in her pregnancy with Teagan. The respondents paid a relative to drive them to Gainesville, Florida, where they signed a one year lease for an apartment.

"In May, 2018, Teagan was born in a Gainesville hospital. The hospital contacted the Florida Department of Children and Families after information came to light that the respondents' other children had been removed from their care. Two days after Teagan's birth, when she was ready to be discharged from the hospital, the Florida department took emergency custody of her. The Florida department contacted the Connecticut department to report that the mother had given birth.

"One day after the Florida department took emergency custody of Teagan, the [petitioner] filed a motion in the Connecticut Superior Court for Juvenile Matters at Waterford (trial court) seeking temporary custody of Teagan and a petition seeking to adjudicate Teagan neglected on the grounds that she would be subject to conditions injurious to her well-being if she remained in the respondents' care or that she was denied proper care and attention. The motion for temporary custody was denied on the ground that the child was not in Connecticut.

"Shortly thereafter, the Florida department filed in the Circuit Court of the Eighth Judicial Circuit of Florida, Juvenile Division (Florida court), a motion to transfer jurisdiction to the Connecticut trial court on the basis of the family's history with service providers and child protective services in this state. The respondents opposed the motion. A Florida general magistrate held a contested hearing on the motion, at which the respondents were represented by separate counsel. Following the hearing, the magistrate issued a report and a recommendation to grant the motion.

"The recommendation rested on the following factual findings. An open dependency case in Connecticut was then pending on a petition for termination of the respondents' parental rights with respect to Teagan's sibling, J. The [petitioner] wanted to add Teagan to the open dependency case. The respondents had admitted to the Florida department that they traveled to Florida before Teagan's birth to avoid further involvement with the Connecticut department. Witnesses and persons with knowledge of the issues pertaining to Teagan's possible neglect and to the possible termination of the respondents' parental rights as to J reside in Connecticut. The respondents previously had been involved with the Con-

necticut department as children, and their parental rights with respect to another child had been terminated. Teagan's guardian ad litem and the Connecticut department both supported the transfer of jurisdiction. The Florida court had verified with the Connecticut trial court, *Driscoll, J.*, that the Connecticut court wanted to, and would, accept jurisdiction.

"The magistrate acknowledged that the respondents opposed the transfer of jurisdiction and that, in support of their opposition, they had presented a copy of their Florida lease and represented that the father was employed in Gainesville. The magistrate also acknowledged that the respondents had offered to consent to Teagan's dependency if the Florida court retained jurisdiction, to eliminate the need for witnesses and to allow the court to rely solely on documentation from the Connecticut department to establish a reunification plan. The magistrate noted, however, that the Florida department and Teagan's guardian ad litem represented that they had no intention of offering or supporting reunification should the Florida court retain jurisdiction and, instead, would seek to terminate the respondents' parental rights with respect to Teagan on the basis of the respondents' prior history.

"The magistrate's report concluded: Connecticut is a more convenient forum state, and the court finds that it is in the best interests of the child . . . and will promote the efficient administration of justice to transfer jurisdiction to Connecticut. The following day, after the parties waived the period for filing exceptions to the magistrate's report, the Florida court ratified and adopted the magistrate's recommendation to transfer jurisdiction to the Connecticut court.

"The [petitioner] then renewed her request for an ex parte order for temporary custody of Teagan in the trial court, which the court, *Driscoll, J.*, granted. Teagan was brought to Connecticut and placed with the same foster family caring for her sibling, J.

"The father filed a motion to dismiss the pending neglect petition on the ground of lack of subject matter jurisdiction. Appended to the motion were copies of the respondents' Florida lease, a pay stub from the father's Florida employment, and the father's Florida voter registration card, which was issued after the Florida court proceeding. The [petitioner] opposed the motion, contending that the Florida court's inconvenient forum determination established a basis for the Connecticut trial court's subject matter jurisdiction under the UCCJEA. After a contested hearing on the motion, the trial court, *Hon. Michael A. Mack*, judge trial referee, opened the evidence twice—once to take evidence that the father had appealed from the Florida court's decision granting the motion to transfer, and again to take evidence that the First District Court of Appeal of Florida had issued a per curiam, summary affirmance.

"The Connecticut trial court denied the father's motion to dismiss. The court cited two reasons. First, the trial court reasoned that a Florida District Court of Appeal had affirmed that jurisdiction rests with Connecticut courts, after the respondents had had an opportunity to present evidence in that forum on the matter and had failed to present such evidence. Second, the trial court determined that the respondents could not seek equitable redress because they did not come to the court with clean hands, given their admission to the Florida department that they had traveled to Florida to avoid involvement with the Connecticut department. Ultimately, the trial court concluded that it has subject matter jurisdiction over Teagan's case following the dictates of the [UCCJEA] in that a court of Florida has declined to exercise jurisdiction on the ground that Connecticut is the more appropriate forum, [a Florida District Court of Appeal] has affirmed that, and Connecticut has accepted that conclusion.

"The father appealed from the trial court's decision denying his motion to dismiss to the Appellate Court. [The appeal was transferred to our Supreme Court] pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. After the father filed his brief with [our Supreme Court], but before the [petitioner] filed her appellate brief, the [petitioner] filed a petition in the trial court seeking to terminate the respondents' parental rights with respect to Teagan." (Footnotes omitted; internal quotation marks omitted.) *In re Teagan K.-O.*, 335 Conn. 745, 748–54, 242 A.3d 59 (2020).

On June 24, 2020, our Supreme Court reversed the judgment of the trial court and remanded the case with direction to grant the respondent father's motion to dismiss. Id., 747, 786. The court concluded that the trial court lacked jurisdiction over the neglect petition that the petitioner had filed in Teagan's interest on May 25, 2018, because, as of that day, Teagan was not present in the state, as required under General Statutes § 46b-121 (a) (1). Id., 765–67. The court further concluded that the failure to satisfy the territorial limitation set forth in § 46b-121 prevented Connecticut courts from exercising jurisdiction over the neglect petition, "irrespective of whether the conditions for exercising jurisdiction under the UCCJEA would be met." Id., 767. Accordingly, the court reversed the judgment of the trial court and remanded the case with direction to dismiss the neglect petition. Id., 786.

Relevant to our resolution of the present appeal, the court clarified the following in a footnote: "Our conclusion that the trial court lacks jurisdiction over the [petitioner's] neglect petition has no effect on the order granting the [petitioner] temporary custody of Teagan. The father did not challenge that order, and Teagan's presence in this state is sufficient to establish a basis for temporary emergency custody. Teagan has resided

with her sibling's foster family since the Connecticut trial court issued the order placing her in the [petitioner's] temporary custody. It is significant to note that our decision is limited to the question of whether Connecticut has jurisdiction to make a final custody decision at the time the custody proceeding was commenced. We have no occasion, in this appeal, to consider whether the UCCJEA would provide another mechanism by which such a temporary order could become a final custody determination under the facts of this case . . . or whether Teagan could remain in the care of her sibling's foster family even if the issue of a final custody determination is made by a Florida court. . . . Should either of those issues, or any other, arise hereafter, they will be addressed in the first instance by a Connecticut court." (Citations omitted.) Id., 786–87 n.33.

The following additional undisputed procedural history is relevant to this appeal. After our Supreme Court's decision was released, counsel for the respondent parents and counsel for the petitioner participated in a conference call with representatives and attorneys from the Florida department. During the call, Attorney Stefanie Camfield, assistant general counsel for the Florida department, indicated that the Florida department required more information about the status of Teagan's case in order to decide how to proceed following our Supreme Court's decision. The petitioner then filed a motion asking the trial court to release its records regarding Teagan to Camfield and to the Florida department.

The petitioner also filed a motion for in-court review so that the trial court could dismiss the neglect petition in accordance with our Supreme Court's decision and so that the parties could address how that decision impacted the pending termination of parental rights petition. Two days later, the respondent father filed a motion in which he asked the court to vacate its order vesting temporary custody of Teagan in the petitioner and to immediately turn over physical custody of Teagan to her parents. In support of his motion, the respondent father cited only our Supreme Court's decision. The petitioner objected to the motion, representing that the respondent parents had not had any contact with Teagan in nearly one year and that their circumstances had not changed such that they could safely care for Teagan. Counsel for Teagan also objected to the motion. Following our Supreme Court's ruling, the respondent mother did not file a motion for reconsideration or otherwise raise an issue about the effect of the dismissal of the neglect petition on the order of temporary custody.

The court, *Driscoll, J.*, held an in-court review in which it heard arguments with respect to these motions and objections on August 4, 2020. The court, by agreement of all of the parties, granted the petitioner's motion

to release the court's records to Camfield, who participated in the hearing virtually from Tallahassee, Florida. The court also dismissed the neglect petition pursuant to the order of our Supreme Court and indicated that it would not grant the respondent father's motion to vacate the order of temporary custody without holding a hearing. The respondent parents did not request an evidentiary hearing, nor did they argue that the order of temporary custody should be vacated as a matter of law.

During the in-court review, Camfield reported that the Florida department had reviewed our Supreme Court's decision and that Teagan would have to "physically reenter Florida in order for [the Florida department] to effectuate a new shelter on that child." Camfield further asserted that the Florida department "cannot shelter a child that's in another state." When asked if the Florida department was declining jurisdiction, Camfield responded: "I don't know if it's declining jurisdiction so much as stating that we do not have jurisdiction over that child by virtue of her being [in Connecticut] for so long." The court then scheduled a case status conference[1] so that the parties could discuss how to proceed. The case status conference was held on August 20, 2020, during which Camfield again expressed the Florida department's reservations about reinstituting proceedings in Florida, given that Teagan was residing in Connecticut.

On August 26, 2020, the petitioner filed a motion for order regarding jurisdiction, in which she asked the court to find that it had jurisdiction over Teagan's case, including the pending petition for termination of parental rights pursuant to General Statutes § 46b-115n. The petitioner argued in her motion that § 46b-115n, a provision of the UCCJEA that has been adopted by both Connecticut and Florida, is the provision that our Supreme Court determined to empower the Superior Court to exercise temporary emergency jurisdiction over Teagan, although it had originally lacked jurisdiction over the neglect petition filed with respect to Teagan. The petitioner further argued that under § 46b-115n (b) temporary emergency jurisdiction can become permanent if three conditions are satisfied: "(1) A child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under a provision substantially similar to section 46b-115k, 46b-115*l* or 46b-115m; (2) this state has become the home state of the child; and (3) the child custody determination provides that it is a final determination." General Statutes § 46b-115n (b). The petitioner asserted that the first two of these conditions had already been satisfied by the facts that Florida had declined jurisdiction and that the child had been living in Connecticut for more than six months. The petitioner further asserted that the court should satisfy the third condition by making "clear that the order of temporary custody that [the court] issued

on June 25, 2018, is a final custody determination for purposes of jurisdiction under the UCCJEA.''

The trial court, *Hoffman, J.*, held a hearing on the motion on September 24, 2020. At the hearing, both parents stipulated to the fact that the first two conditions of § 46b-115n (b) were satisfied, acknowledging that Connecticut had become Teagan's home state and that no proceedings regarding Teagan had been instituted in another state.[2] The respondent father's counsel objected to the petitioner's motion because "[the respondent father believed] that jurisdiction was improperly exercised over the child from the outset. And as a consequence, could not be turned into proper jurisdiction just because the child was kept [in Connecticut].'' At the hearing, the respondent mother did not argue, as she does now, that the court lacked the statutory authority to terminate her parental rights because the neglect petition, on which the order of temporary custody was based, had been dismissed.

Following the argument, the court granted the petitioner's motion. The court explicitly found "that the order of temporary custody that was issued on June 25, 2018, is a final child custody determination for the purposes of jurisdiction under the UCCJEA. There is no other state in which [a] custody proceeding has been commenced. That Connecticut is Teagan's home state under the UCCJEA and the order of temporary custody that Judge Driscoll issued on June [25, 2018] constitutes a final child custody determination. And the court rules that as a matter of law, it has proper jurisdiction over Teagan's case under the statutes.''

After concluding that it had jurisdiction under the UCCJEA, the court, *Hoffman, J.*, consolidated for trial the termination of parental rights petition with the respondent father's motion seeking to vacate the order of temporary custody. The consolidated trial began on March 18, 2021. The court conducted the trial via Microsoft Teams at the request of the respondent parents, who continued to reside in Florida. Following the trial, on July 1, 2021, the court issued a memorandum of decision in which it terminated the parental rights of the respondent parents as to Teagan.

At the outset of its decision, the court noted that it had "found as a matter of law and fact that it may properly exercise jurisdiction over Teagan's case under § 46b-115n (b), including adjudicating the underlying termination of parental rights petition.'' The Superior Court may grant a petition for termination of parental rights if it finds by clear and convincing evidence that (1) the department has made reasonable efforts to locate the parent and reunify the child with the parent, (2) termination is in the best interest of the child, and (3) there exists one or more of the stated adjudicatory grounds for termination of parental rights. See General Statutes § 17a-112. The court found that the petitioner

had proven by clear and convincing evidence the three elements necessary to grant the termination petition: (1) the department had made reasonable efforts to reunify Teagan with her parents and that they were unable or unwilling to benefit from reunification efforts; (2) it was in the best interest of Teagan to terminate the respondent parents' rights; and (3) there existed an adjudicatory ground for terminating the respondent parents' rights. From this judgment, both parents appealed.

In its memorandum of decision, the court also denied the respondent father's motion to vacate the order of temporary custody and immediately reunify Teagan with him. With respect to the respondent father's motion, the court found that, "in light of [its] findings [of fact] on the termination of parental rights [petition] there is no factual basis to vacate the order of temporary custody in that father's circumstances have not changed such that he can now safely care for Teagan." Additional facts and procedural history will be set forth as necessary.

I

AC 44918

On appeal, the respondent mother does not challenge the court's factual findings. Rather, she claims that the judgment terminating her parental rights should be reversed because the court lacked the statutory authority to adjudicate the termination petition. Specifically, she claims that "[w]hen the neglect petition in this case was dismissed on August 4, 2020, it vitiated the statutory predicate for the issuance of the temporary custody order under § 46b-129 (b)." The respondent mother argues, on the basis of the alleged defect in the order of temporary custody, that "the trial court was without statutory authority to adjudicate the parental rights termination petition filed pursuant to . . . § 17a-112" because Teagan was not in the petitioner's custody in accordance with § 46b-129 (b), as required under § 17a-112.[3] Because we determine that the respondent mother's claim is an impermissible collateral attack on the order of temporary custody, we decline to review the merits of this claim. We therefore affirm the judgment of the trial court.

We begin by setting forth the legal principles relevant to the respondent mother's appeal. "The right of appeal is purely statutory [and stems from General Statutes § 52-263]. It is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met. . . . Not only must the appellant be aggrieved by the decision of the court, but the appeal must be taken from a final judgment of the court. Because our jurisdiction over appeals, both criminal and civil, is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the mer-

its of the claim. . . . General Statutes § 46b-142 (b), regarding juvenile matters, provides in relevant part: The Department of Children and Families, or any party at interest aggrieved by any final judgment or order of the court, may appeal to the Appellate Court in accordance with the provisions of section 52-263. . . . Thus, it is important for us to determine initially whether the determinations made regarding neglect and temporary custody were final for purposes of appeal.

"In general, we recognize the statutory principle that appellate jurisdiction is limited to appeals from final judgments. We also recognize, however, that there is a gray area between those judgments which are undoubtedly final and others that are clearly interlocutory and not appealable. . . . The *Curcio* rule provides that [a]n otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them. *State* v. *Curcio*, [191 Conn. 27, 31, 463 A.2d 556 (1983)]. Thus, there have been occasions [i]n both criminal and civil cases, [in which] we have determined certain interlocutory orders and rulings of the Superior Court to be final judgments for purposes of appeal. . . . We note the existence of a narrow category of cases in which certain temporary orders have been held to be appealable final judgments because they so conclude the rights of a party that further proceedings could not affect them. . . .

"In *Madigan* v. *Madigan*, [224 Conn. 749, 753–54, 620 A.2d 1276 (1993)], we applied the *Curcio* standard to determine whether, in the context of a dissolution case, an order of temporary custody was a final judgment for purposes of appeal. In that case, temporary custody orders were entered in favor of the defendant wife during the pendency of a dissolution proceeding in the Superior Court. . . . The plaintiff husband appealed from the temporary custody orders on the grounds that they would interfere with his right to spend significant time with his child, and that such an opportunity cannot be replaced by a subsequent order of custody as part of an ultimate dissolution judgment. . . . The Appellate Court dismissed his appeal for lack of a final judgment. . . . We granted certification to appeal regarding the issue of the finality of the temporary custody order and reversed the Appellate Court's judgment. . . .

"Relying on the second prong of the *Curcio* test, we concluded in *Madigan* that denying immediate relief to an aggrieved parent [would interfere] with the parent's custodial right over a significant period [of time] in a manner that [could not] be redressed by a later appeal. . . . Even a temporary custody order may have a significant impact on a subsequent permanent custody deci-

sion . . . [by] establish[ing] a foundation for a stable long-term relationship that becomes an important factor in determining what final custodial arrangements are in the best interests of the child. . . . We concluded that temporary custody orders did so [conclude] the rights of the parties that further proceedings [could not] affect them . . . and, therefore, they were final for purposes of appeal. . . .

"[C]ourts and state agencies must keep in mind the constitutional limitations imposed [upon them when they undertake] any form of coercive intervention in family affairs . . . [which includes] the right of the family to remain together without the . . . interference of the awesome power of the state. . . . Thus, we consider orders of temporary custody in light of these constitutional considerations and reaffirm our conclusion that an immediate appeal of [a court order of temporary custody] is the only reasonable method of ensuring that the important rights surrounding the parent-child relationship are adequately protected. . . . Accordingly, we conclude that, in order to protect the parent's interest in retaining custody of the child, an order of temporary custody is a final judgment for purposes of appeal. That reasoning means, moreover, that any party with standing to challenge that order by appeal must do so at that time." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *In re Shamika F.*, 256 Conn. 383, 400–405, 773 A.2d 347 (2001).

Moreover, "temporary custody orders are immediately appealable not only to protect a parent's interest in their children, but also to protect the individual interests of the children. . . .

"[S]uch appeals are obligatory so that parents may act in the best interest of their children. A grave injustice would be committed against children if a parent were permitted to appeal from a judgment of temporary custody long after they had established a stable relationship with foster parents. We therefore protect the best interest of the children by requiring parents immediately to appeal decisions that . . . interfere substantially with their family integrity. Those parents must do so in a timely fashion not only to protect themselves, but also to protect the children. Appealing from a temporary custody order after allowing children to languish in foster care for three years does nothing for family integrity. To the contrary, it would interfere seriously with their ability to experience any kind of family stability with either a biological parent or a foster family, even in situations where parents have demonstrated a total lack of interest in reunifying the family. We, therefore, limit a parent's right to attack collaterally a temporary custody order in order to avoid further disruption of the lives of neglected children. By doing so, not only are we protecting the parent-child relationship, but we

are also protecting the important interests of the children.

"The reason for the rule against collateral attack is well stated in these words: The law aims to invest judicial transactions with the utmost permanency consistent with justice. . . . Public policy requires that a term be put to litigation and that judgments, as solemn records upon which valuable rights rest, should not lightly be disturbed or overthrown. . . . [T]he law has established appropriate proceedings to which a judgment party may always resort when he deems himself wronged by the court's decision. . . . If he omits or neglects to test the soundness of the judgment by these or other direct methods available for that purpose, he is in no position to urge its defective or erroneous character when it is pleaded or produced in evidence against him in subsequent proceedings. Unless it is entirely invalid and that fact is disclosed by an inspection of the record itself the judgment is invulnerable to indirect assaults upon it. . . . Although public policy in Connecticut favors the protection of the integrity of the family, there is also a strong public policy in favor of protecting the best interest of our children. It is in the best interest of the children, especially those growing up in situations of neglect, that the state provide them with a stable family life to the extent that it is able to do so. The [petitioner] and the department seek to do this through our state foster care system. Allowing a collateral attack [several] years into that effort would undermine the purpose of the collateral attack rule as well as the goal of our state agencies in protecting the neglected children of Connecticut." (Citation omitted; internal quotation marks omitted.) Id., 405–407.

In *In re Shamika F.*, which involved strikingly similar facts to the present case, the respondent parents moved back and forth between New York and Connecticut several times, during which time the department investigated reports of neglect. Id., 386–87. After the family returned to Connecticut, the department received another report that the respondents' minor children had been neglected. Id. The petitioner then filed neglect petitions with respect to the children and sought ex parte orders vesting her with temporary custody of the children. Id., 387. The court issued the orders of temporary custody, and neither parent challenged the court's jurisdiction at that time. Id., 387–88.

More than two years later, after the petitioner had filed petitions for termination of parental rights, the respondent father argued in a motion for in-court review "that the court should consider transferring the case to the New York state child protection agency and the Interstate Compact on the Placement of Children." Id., 390–93. The court denied the motion. Id., 393. Prior to the termination of parental rights trial, the respondent father again challenged the court's jurisdiction by filing

a motion in which he claimed that Connecticut lacked jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA), General Statutes (Rev. to 1999) § 46b-90 et seq., the predecessor to the UCCJEA. Id., 394–95. Specifically, he argued that the court lacked jurisdiction over the termination of parental rights petitions because New York, rather than Connecticut, was the children's home state at the time the neglect petitions were filed. Id., 395. The trial court disagreed, denied the motion, and held a trial on the petitions for termination of parental rights. Id., 397. Following the trial, the court terminated the parental rights of the respondent parents. Id., 398. On appeal, the respondent father challenged the trial court's decision to terminate his parental rights based on the alleged jurisdictional error that the court had committed during the proceedings on the orders of temporary custody. Id., 398. Our Supreme Court declined to consider the father's jurisdictional claim because "[h]e had a fair chance to [litigate the issue of Connecticut's jurisdiction] at the time of the neglect and temporary custody proceedings, and he failed to act." Id., 408. The court further noted that "his failure to act at the time the temporary custody orders were entered does not give him a right at this late date to launch a collateral attack on the neglect and temporary custody proceedings." Id., 407.

In the present case, the respondent mother did not appeal from the June, 2018 order of temporary custody, which was a final judgment for purposes of appeal. She now attempts to attack the judgment terminating her parental rights by challenging the June, 2018 order of temporary custody. On appeal, the respondent mother argues that the order of temporary custody, "as a matter of law, could not be sustained in accordance with . . . § 46b-129 once the underlying neglect petition was dismissed." She further argues that, "[t]here being no legal basis for the [petitioner] to have custody of Teagan under . . . § 46b-129, the trial court was without statutory authority to adjudicate the parental rights termination petition filed pursuant to . . . § 17a-112." This is the only claim that she advances on appeal.

Just as the respondent father in *In re Shamika F.*, the respondent mother in the present case had a fair chance to litigate any issue with respect to the order of temporary custody at the time that it was issued, and again when the neglect petition was dismissed, but she failed to do so. At the time of the termination of parental rights trial, the order of temporary custody had been in place for nearly three years, and it had remained in effect for more than seven months following the dismissal of the neglect petition. At no point during that period did the respondent mother claim that there was a defect in the order of temporary custody, nor did she move to have the temporary order vacated. As we iterated previously in this opinion, it is well settled that "any party with standing to challenge [an]

order [of temporary custody] by appeal *must do so at that time*." (Emphasis added.) Id., 405. The respondent mother's failure to appeal from the order of temporary custody precludes her from launching a collateral attack on the temporary custody proceedings following the termination of her parental rights. We, therefore, decline to reach the merits of this claim on appeal.

## II

### AC 44923

On appeal, the respondent father claims that the court lacked jurisdiction under the UCCJEA to adjudicate the petition for termination of parental rights. Specifically, he claims that "the statutes implicated do not allow the trial court to convert a temporary order into a final custody determination" and, therefore, "the trial court never had . . . jurisdiction" to decide the termination of parental rights petition.[4] We disagree.

We begin by setting forth the legal principles relevant to the respondent father's appeal. This appeal requires us to interpret certain provisions of the UCCJEA. The UCCJEA was "adopted by this state in 1999 . . . [and] replaced a largely similar scheme adopted in 1978, known as the [UCCJA]." (Citation omitted.) *In re Teagan K.-O.*, supra, 335 Conn. 760. "The purposes of the UCCJEA are to avoid jurisdictional competition and conflict with courts of other states in matters of child custody; promote cooperation with the courts of other states; discourage continuing controversies over child custody; deter abductions; avoid [relitigation] of custody decisions; and to facilitate the enforcement of custody decrees of other states. . . . The UCCJEA addresses [interjurisdictional] issues related to child custody and visitation. . . . The UCCJEA is the enabling legislation for the court's jurisdiction." (Internal quotation marks omitted.) *Parisi* v. *Niblett*, 199 Conn. App. 761, 770, 238 A.3d 740 (2020). "To effect [these purposes], the UCCJEA provides rules for determining jurisdiction in custody cases involving multiple states." (Internal quotation marks omitted.) *In re Teagan K.-O.*, supra, 775.

The UCCJEA sets out three means by which a state may exercise jurisdiction over a child custody case that involves multiple states. Depending on the circumstances, a state can (1) make an initial child custody determination, (2) modify a child custody determination made by another state, or (3) exercise temporary emergency jurisdiction. See General Statutes § 46b-115k (initial child custody jurisdiction); General Statutes § 46b-115m (modification jurisdiction); General Statutes § 46b-115n (temporary emergency jurisdiction).

When making an initial child custody determination, there are several possible bases for a Connecticut court to exercise jurisdiction. See General Statutes § 46b-115k (a) (1) through (6). "[A Connecticut] court has jurisdic-

tion to make an initial custody determination if: (1) This state is the home state of the child on the date of the commencement of the child custody proceeding; (2) This state was the home state of the child within six months of the commencement of the child custody proceeding, the child is absent from the state, and a parent or a person acting as a parent continues to reside in the state; (3) A court of another state does not have jurisdiction under subdivisions (1) or (2) of this subsection, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships; (4) A court of another state which is the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under a provision substantially similar to section 46b-115q or section 46b-115r, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships; (5) All courts having jurisdiction under subdivisions (1) to (4), inclusive, of this subsection have declined jurisdiction on the ground that a court of this state is the more appropriate forum to determine custody under a provision substantially similar to section 46b-115q or section 46b-115r; or (6) No court of any other state would have jurisdiction under subdivisions (1) to (5), inclusive, of this subsection. . . ." General Statutes § 46b-115k (a).

Even if a Connecticut court lacks jurisdiction to make an initial child custody determination, it nevertheless may exercise temporary emergency jurisdiction. See General Statutes § 46b-115n (a). Under § 46b-115n (a), "[a] court of this state [may exercise] temporary emergency jurisdiction if the child is present in this state and (1) the child has been abandoned, or (2) it is necessary in an emergency to protect the child . . . ." Section 46b-115n (b) further provides in relevant part: "If there is no previous child custody determination that is enforceable under this chapter and a child custody proceeding has not been commenced in a court of a state having jurisdiction . . . a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction . . . . A child custody determination made under this section shall be a final determination if: (1) A child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under a provision substantially similar to section 46b-115k, 46b-115*l* or 46b-115m; (2) this state has become the home state of the child; and (3) the child custody determination provides that it is a final determination."

The respondent father claims that the court lacked

jurisdiction under the UCCJEA to adjudicate the petition for termination of parental rights because the court did not make a final child custody determination. The respondent father makes two specific arguments with respect to this claim. First, he argues that the June 25, 2018 order vesting temporary custody of Teagan in the petitioner could not be a final child custody determination because it was, by definition, temporary, rather than final. Second, the respondent father argues that § 46b-115n (b) did not allow the trial court to later convert the order of temporary custody into a final child custody determination. The manner in which the respondent father frames his arguments, however, is legally flawed and does not accurately characterize the relevant issue in the present case. The petitioner's motion for order regarding jurisdiction asked the court to make a final determination of *jurisdiction* and to determine which forum would retain jurisdiction over the child custody proceedings. In adjudicating the motion, during the September 24, 2020 hearing, the court found "that the order of temporary custody that was issued on June 25, 2018, is a final custody determination *for the purposes of jurisdiction of the UCCJEA*." (Emphasis added.) What the respondent father misconstrues in framing his arguments is that the order of temporary custody did not become a final custody determination at the September 24, 2020 hearing, but, rather, the court issued a final determination of jurisdiction. Specifically, the court determined that Connecticut would retain jurisdiction over the matter and would move forward in adjudicating the termination of parental rights petition. Despite the flaw in the manner in which the respondent father has couched his arguments, after considering their substance, we believe that they are more accurately framed as whether a court's exercise of temporary emergency jurisdiction can become a final determination of jurisdiction under § 46b-115n (b), and, if so, whether a final determination of jurisdiction was made in the present case.

In order to determine whether a court's exercise of temporary emergency jurisdiction can become a final determination of jurisdiction under § 46b-115n (b), we must interpret the relevant statutory language of § 46b-115n. "[O]ur fundamental objective [in statutory construction] is to ascertain and give effect to the apparent intent of the legislature . . . ." (Internal quotation marks omitted.) *State* v. *Panek*, 328 Conn. 219, 225, 177 A.3d 1113 (2018). General Statutes § 1-2z provides that "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." In *State* v. *Panek*, supra, 225–26, our Supreme

Court noted that, "[w]hen a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . [O]ur case law is clear that ambiguity exists only if the statutory language at issue is susceptible to more than one plausible interpretation." (Citation omitted; internal quotation marks omitted.) Further, "[w]e do not read statutory language in isolation, but rather must consider it within the context of the statute as a whole and in harmony with surrounding text." *Norris* v. *Trumbull*, 187 Conn. App. 201, 219, 201 A.3d 1137 (2019). Finally, we note that "[i]ssues of statutory construction . . . are . . . matters of law subject to our plenary review." (Internal quotation marks omitted.) *Rutter* v. *Janis*, 334 Conn. 722, 730, 224 A.3d 525 (2020).

On the basis of the plain language of § 46b-115n (b), we determine that a child custody determination made pursuant to the court's temporary emergency jurisdiction can become a final determination of jurisdiction when the conditions of that statute are satisfied. Section 46b-115n (b) provides in relevant part that "[a] *child custody determination made under this section shall be a final determination if*: (1) A child custody proceeding has not been or is not commenced in a court of a state having jurisdiction . . . (2) this state has become the home state of the child; and (3) the child custody determination provides that it is a final determination." (Emphasis added.) In order to interpret this provision, we turn to the definition of a "child custody determination" under the statute. A " '[c]hild custody determination' means a judgment, decree, or other order of a court providing for the legal custody, physical custody or visitation with respect to a child. The term includes a permanent, *temporary*, initial and modification order. . . ." (Emphasis added.) General Statutes § 46b-115a (3). As we noted previously in this opinion, § 46b-115n (b) provides that "[a] child custody determination made under this section shall be a final determination" if the three stated conditions are satisfied. It follows that a child custody determination, which by definition includes a *temporary* order, can become a "final determination" if the conditions set forth in § 46b-115n (b) are met.

In order to ascertain the meaning of "final determination," which our legislature did not define, we turn to the dictionary definition of "determination." "In interpreting statutes, words and phrases not otherwise defined by the statutory scheme are construed according to their commonly approved usage . . . . In determining the commonly approved usage of the statutory language at issue, we consult dictionary definitions." (Citations omitted; internal quotation marks omitted.) *Commission*

*on Human Rights & Opportunities* v. *Edge Fitness, LLC*, 342 Conn. 25, 32, 268 A.3d 630 (2022). Merriam-Webster's Collegiate Dictionary defines "determination," inter alia, as "a judicial decision settling and ending a controversy." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 340. It follows that a final "determination" under § 46b-115n (b) means the settling or ending of a controversy with respect to this section. Section 46b-115n (b) governs the court's temporary emergency jurisdiction, establishing when the court may exercise temporary emergency jurisdiction, how long orders made pursuant to the court's temporary emergency jurisdiction will last, and how to settle disputes of jurisdiction that occur when another state claims that it has jurisdiction or has commenced a custody proceeding with respect to the same child. See General Statutes § 46b-115n. A "controversy" under this section, therefore, refers to the issue of which state is going to exercise jurisdiction over a child custody proceeding in cases involving multiple states. Thus, a "final determination" for the purposes of § 46b-115n (b) means a final determination of jurisdiction.

Further, § 46b-115n (b) provides in relevant part that "[a] child custody determination made under this section shall be a final determination if: (1) A child custody proceeding has not been or is not commenced in a court of a state having jurisdiction . . . (2) this state has become the home state of the child; and (3) the child custody determination provides that it is a final determination." As we explained previously in this opinion, the conditions that must be met in order for a child custody determination to become a "final determination" focus on jurisdictional conflicts such as whether another state has attempted to exercise jurisdiction over the proceeding and whether the state that issued an order pursuant to its temporary emergency jurisdiction has become the home state of the child. This indicates that the controversy for which there is a "final determination" under § 46b-115n (b) is the issue of which state will exercise jurisdiction over the child custody proceeding. Therefore, the language of § 46b-115n (b) is susceptible to only one reasonable interpretation, namely, that a "final determination" refers to a determination of which state will exercise jurisdiction over the proceedings.

Our interpretation is bolstered by other relevant language in § 46b-115n (b). Section 46b-115n (b) provides in relevant part that "[if] there is no previous child custody determination that is enforceable under this chapter and a child custody proceeding has not been commenced in a court of a state having jurisdiction . . . a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction . . . ." Because § 46b-115n governs temporary emergency jurisdiction, the statute's reference to "[a] child custody determination *made under this section*" refers to a child custody

determination made pursuant to the court's temporary emergency jurisdiction. (Emphasis added.) General Statutes § 46b-115n (b). A custody determination made under § 46b-115n (b) remains in effect only "until an order is obtained from a court of a state having jurisdiction . . . ." By its plain language, § 46b-115n (b) establishes that a custody determination made by a court pursuant to its temporary emergency jurisdiction is "temporary" in that it lasts only until an order is obtained from a state that has preferred jurisdiction. This language is significant because it establishes that the limitation on a court's temporary emergency jurisdiction is the existence of a state with preferred jurisdiction. If there is no state that has preferred jurisdiction or if an order is never obtained from a court of a state with preferred jurisdiction, it follows that Connecticut's jurisdiction would continue.

The language of § 46b-115n (c) further supports our interpretation. It is well settled that "the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008). Section 46b-115n (c) provides in relevant part: "If there is a previous child custody determination that is enforceable under this chapter or if a child custody proceeding has been commenced in a court of a state having jurisdiction . . . the court of this state which issues an order pursuant to this section shall specify that such order is effective for a period of time which the court deems adequate to allow the person seeking an order to obtain such an order from the other state which has jurisdiction. *Such order shall be effective for that period of time specified in the order or until an order is obtained from the other state whichever occurs first.*" On the basis of the plain language of § 46b-115n (c), an order pursuant to the court's temporary emergency jurisdiction is effective "for that period of time specified in the order or until an order is obtained from [another] state . . . ." This indicates that the temporary nature of temporary emergency jurisdiction has to do with the expiration of the order itself or the exercise of jurisdiction by another state with preferred jurisdiction. If the court's temporary emergency jurisdiction is not cut short by either of those occurrences, however, § 46b-115n (b) provides that the court's temporary emergency jurisdiction can become a final determination of jurisdiction under certain circumstances.

On reading § 46b-115n (b) and considering it in the

context of § 46b-115n as a whole, the only reasonable interpretation of that statute is that an exercise of the court's temporary emergency jurisdiction can become a final determination of jurisdiction if the three conditions set forth in § 46b-115n (b) are satisfied. In other words, if Connecticut has become the home state of the child, a child custody proceeding has not been commenced by another state having jurisdiction, and the child custody determination provides that it is a final determination, Connecticut's temporary emergency jurisdiction can ripen into a final determination of jurisdiction.[5]

Because we conclude that an exercise of temporary emergency jurisdiction under § 46b-115n (a) can become a final determination of jurisdiction under § 46b-115n (b), we must now address whether the conditions required to do so were satisfied in the present case. As we stated previously in this opinion, the respondent father does not dispute that the first two conditions had been met, namely, that Connecticut had become Teagan's home state and that proceedings had not been instituted in any other state. He stipulated to these facts during the September 24, 2020 hearing. We conclude that the third condition was satisfied because the court explicitly determined during the September 24, 2020 hearing "that the order of temporary custody that was issued on June 25, 2018, is a final child custody determination for the purposes of jurisdiction of the UCCJEA." Thus, the court made the explicit finding that all three conditions of § 46b-115n (b) had been satisfied during the hearing on September 24, 2020. When it did so, the court made a final determination for the purposes of jurisdiction, deciding that it would retain jurisdiction over this matter and later adjudicate the termination of parental rights petition.

We conclude that there was a final determination for the purposes of jurisdiction under the UCCJEA. Therefore, the court had jurisdiction to adjudicate the petition for termination of the respondent father's parental rights. Because we determine that the court had jurisdiction to adjudicate the petition, and because the jurisdictional claim is the only claim that the respondent father advances on appeal, we affirm the judgment of the court terminating the respondent father's parental rights.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** April 27, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] A case status conference is a procedure in juvenile matters, including termination of parental rights proceedings, used to discuss a pending case and encourage settlement. See Practice Book §§ 35a-2 and 35a-18. "When

the allegations of the petition are denied, necessitating testimony in support of the petitioner's allegations, the case shall be continued for a case status conference . . . ." Practice Book § 35a-2 (a). "Parties with decision-making authority to settle must be present or immediately accessible during a case status conference . . . ." Practice Book § 35a-2 (b). "At the case status conference . . . all attorneys and self-represented parties will be prepared to discuss the following matters: (1) Settlement; (2) Simplification and narrowing of the issues; (3) Amendments to the pleadings; (4) The setting of firm trial dates; (5) Preliminary witness lists; (6) Identification of necessary arrangements for trial . . . (7) Such other actions as may aid in the disposition of the case." Practice Book § 35a-2 (c).

[2] A child's "[h]ome state," as defined by the UCCJEA, "means the state in which a child lived with a parent or person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. . . ." General Statutes § 46b-115a (7). In the present case, Teagan had resided continuously in Connecticut since June, 2018, more than six months before the petitioner filed the termination petition. With respect to the second condition, Camfield confirmed that the Florida department had not instituted any proceedings in Florida regarding Teagan.

[3] General Statutes § 17a-112 (a) provides in relevant part: "*In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129*, either the commissioner, or the attorney who represented such child in a pending or prior proceeding, or an attorney appointed by the Superior Court on its own motion, or an attorney retained by such child after attaining the age of fourteen, may petition the court for the termination of parental rights with reference to such child. . . ." (Emphasis added.)

[4] We note that, in his brief, the respondent father framed his argument in terms of subject matter jurisdiction. Our Supreme Court, however, in the respondent father's first appeal, explained that "the UCCJEA does not confer subject matter jurisdiction on our courts but instead determines whether our courts may exercise existing jurisdiction or must defer to another state's jurisdiction . . . ." *In re Teagan K.-O.*, supra, 335 Conn. 782. The trial court had subject matter jurisdiction over this child protection case because General Statutes §§ 46b-1 and 46b-121 grant the Superior Court subject matter jurisdiction over juvenile matters, including "all proceedings . . . concerning . . . termination of parental rights of children committed to a state agency . . . ." General Statutes § 46b-121 (a) (1). The issue in the present appeal is whether the UCCJEA required the trial court to defer to another state's jurisdiction.

[5] Section 46b-115n is based on § 204 of the UCCJEA, a model act that Connecticut has adopted. We note that our interpretation of § 46b-115n (b) is consistent with the official commentary to § 204 of the UCCJEA, upon which § 46b-115n is based. See Unif. Child Custody Jurisdiction Enforcement Act (1997) § 204, comment, 9 U.L.A. (Pt. 1A) 518–19 (2019).